**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                      )

**AMERICAN TRANSPARENCY,**        )
*d/b/a* OpenTheBooks.com,         )
                                        )

     **Plaintiff,**                 )
                                        )

         **v.**                      )     **Civil No. 21-cv-02821 (APM)**
                                        )

**U.S. DEPARTMENT OF HEALTH AND**   )
**HUMAN SERVICES,**          )
                                        )

     **Defendant.**                )
_____)

**MEMORANDUM OPINION AND ORDER**

**I.**

Plaintiff in this case is American Transparency, d/b/a OpenTheBooks.com, whose "mission is to post online all publicly available government spending." Compl., ECF No. 1, ¶ 3. Plaintiff submitted a Freedom of Information Act (FOIA) request to the National Institutes of Health (NIH), a component of Defendant U.S. Department of Health and Human Services, seeking information about the royalties paid to its employees. After Plaintiff filed the instant action to compel production, Defendant released records of most of the information Plaintiff sought. But Defendant withheld the amounts of individual royalty distributions paid to NIH-employed inventors pursuant to Exemptions 3, 4, and 6.

Before the court are Defendant's Motion for Summary Judgment, ECF No. 24 [hereinafter Def.'s Mot.], and Plaintiff's Cross-Motion for Summary Judgment, ECF No. 28 [hereinafter Pl.'s Mot.]. The court denies both motions. The court agrees with Plaintiff that Defendant may not withhold the requested information pursuant to Exemption 6. However, there is a genuine dispute

of material fact as to whether Defendant properly withheld the requested information pursuant to

Exemptions 3 and 4.

## II.

On September 15, 2021, Plaintiff submitted a FOIA request to NIH, seeking:

> A complete list/database of all personal royalties paid (including, but not limited to, FY2020) to *current and former* National Institutes of Health employees for work done while they were federally employed. The list/database should include, but not be limited to, the royalty recipient's name, the amount of the royalty, the reason for the royalty, the date the royalty was paid, and the name of the entity paying the royalty.

Def.'s Mot., Ex. 2, ECF No. 24-4. Approximately one month later, having received only an

acknowledgment letter, Plaintiff filed this action to compel production. Compl. By September

2022, Defendant had provided Plaintiff with nine productions and a final response to its request.

Def.'s Mot., Def.'s Stmt. of Material Facts Not in Genuine Dispute, ECF No. 24-2 [hereinafter

Def.'s Stmt.], ¶ 5. After Plaintiff inquired about some of the information Defendant withheld,

Defendant re-released 2,945 pages to Plaintiff with additional information included. *Id.* ¶¶ 7–8.

This largely satisfied Plaintiff's request. Pl.'s Mot., Pl.'s Stmt. of Material Facts, ECF No. 28-2

[hereinafter Pl.'s Stmt.], ¶ 10. But Defendant continued to withhold the information at issue here—

the royalty distributions paid to inventors—under Exemptions 3, 4, and 6. *Id.* ¶ 9.

These so-called "inventor awards" are the amounts NIH pays its scientists after a private

company licenses NIH-owned technology. Def.'s Stmt. ¶ 9; Def.'s Reply in Supp. of Summ. J. &

Resp. to Pl.'s Mot., ECF No. 33 [hereinafter Def.'s Reply], Def.'s Suppl. Stmt. of Material Facts,

ECF No. 33-1 [hereinafter Def.'s Suppl. Stmt.], at 11, ¶ 14. When a private company seeks to

license NIH-owned technology, it must propose and then negotiate how much it will pay NIH in

royalties. Def.'s Suppl. Stmt. at 11, ¶ 11. NIH then distributes a portion of those royalties to its

scientist(s) who invented the technology.  *Id.* at 10, ¶ 6.  The governing statute mandates that NIH

pay the inventor(s) "the first $2,000, and thereafter at least 15 percent, of the royalties" received

from the licensee each year.  15 U.S.C. § 3710c(a)(1)(A)(i).  NIH represents that it pays its

inventors the first $2,000, 15% of the royalties above $2,000 and up to $50,000, and 25% of the

royalties above $50,000.  Def.'s Suppl. Stmt. at 13, ¶ 27.  An inventor may not receive more than

$150,000 in aggregate royalty distributions annually.  15 U.S.C. § 3710c(a)(3).

From 2006 to 2022, NIH scientists collectively received anywhere from $7.6 million to

$15 million in royalty distributions each year.  Pl.'s Stmt. ¶ 20.  These royalty payments have

received attention from both the press and political officials.  *Id.* ¶¶ 21, 23.

The court first ordered the parties to meet and confer about Plaintiff's request in November

2021.  Order, ECF No. 9.  After two years of periodically updating the court on Defendant's

progress in responding to it, the parties filed these cross-motions for summary judgment.

### III.

The court will grant summary judgment "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

Civ. P. 56(a).  A "material" fact is one "that might affect the outcome of the suit."  *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In FOIA cases, the burden is on the agency to show that an exemption applies.  *Alyeska*

*Pipeline Serv. v. EPA*, 856 F.2d 309, 311 (D.C. Cir. 1988).  The agency must show that (1) the

requested materials fall within the scope of the exemption, and (2) "it is reasonably foreseeable

that release of those materials would cause harm to an interest protected by" the exemption.

*Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 361 (D.C. Cir. 2021) (citing 5 U.S.C.

§ 552(a)(8)(A)(i)(I)).  Where, as here, the agency has attempted to support its invocation of the

exemption by affidavit, the court will grant the agency summary judgment "when the affidavits describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Larson v. U.S. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009) (internal quotation marks omitted).[1]   Summary judgment is inappropriate, however, when the plaintiff provides "specific facts demonstrating that there is a genuine issue with respect to whether the agency has improperly withheld extant agency records" under the claimed exemption. *Span v. U.S. Dep't of Just.*, 696 F. Supp. 2d 113, 119 (D.D.C. 2010) (internal quotation marks omitted).  When that is the case, the court must hold an evidentiary hearing or bench trial to resolve the outstanding dispute. *Scudder v. CIA*, 25 F. Supp. 3d 19, 29 (D.D.C. 2014).

The court begins with Exemption 6.  The court then discusses Exemptions 3 and 4, which rise and fall together.

## A.

Exemption 6 allows an agency to withhold "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6).  "Similar files" includes "[g]overnment records on an individual which can be identified as applying to that individual." *U.S. Dep't of State v. Washington Post Co.*, 456 U.S.

---

[1] Plaintiff contends that Defendant's affidavits are deficient.  Pl.'s Mot., Mem. of P. & A. in Opp'n to Def.'s Mot. and in Supp. of Pl.'s Mot., ECF No. 28-1, at 3–6.  Plaintiff argues that Mr. Garcia-Malene's declaration is unsigned, contains impermissible legal conclusions, and offers factual assertions that go beyond his personal knowledge.  *Id.* at 3–5.  Plaintiff also argues that Dr. Freire's declaration is outdated and relies on hearsay.  *Id.* at 5–6.  On the first objection, the court observes that Mr. Garcia-Malene's declaration is affixed with a digital signature.  Decl. of Gorka Garcia-Malene, ECF No. 24-3, at 9.  As to the remaining objections, the court need not take them up now.  There is enough evidence in the record—both from Mr. Garcia-Malene's statements that are clearly within his personal knowledge and elsewhere—to create a genuine dispute of material fact as to whether Defendant properly withheld the requested information.  That suffices for now, and the court will resolve the outstanding objections in future proceedings.

595, 602 (1982) (internal quotation marks omitted). Plaintiff does not dispute that records reflecting inventor awards fall under the "broad" umbrella of "similar files." *Id.* at 600; *see generally* Pl.'s Mot., Mem. of P. & A. in Opp'n to Def.'s Mot. and in Supp. of Pl.'s Mot., ECF No. 28-1 [hereinafter Pl.'s Mem.], at 13–22.

To determine whether disclosing the files would constitute a "clearly unwarranted invasion of personal privacy," 5 U.S.C. § 552(b)(6), the court must "balance the interest of the general public in disclosure against the privacy rights of individuals." *Washington Post Co. v. U.S. Dep't of Health & Hum. Servs.*, 690 F.2d 252, 258 (D.C. Cir. 1982). The privacy interest must be "substantial, as opposed to [] *de minimis*." *Nat'l Ass'n of Retired Fed. Emps. v. Horner*, 879 F.2d 873, 874 (D.C. Cir. 1989). "If no significant privacy interest is implicated," then "FOIA demands disclosure." *Id.* On the other side of the ledger, the "public interest under FOIA is 'the citizens' right to be informed about what their government is up to.'" *PETA v. NIH*, 745 F.3d 535, 542 (D.C. Cir. 2014) (quoting *U.S. Dep't of Just. v. Reps. Comm. for Freedom of the Press*, 489 U.S. 749, 773 (1989)). In performing this balancing, "Exemption 6's requirement that disclosure be 'clearly unwarranted' instructs [the court] to tilt the balance (of disclosure interests against privacy interests) in favor of disclosure." *Washington Post*, 690 F.2d at 261 (internal quotation marks omitted). In fact, "under Exemption 6, the presumption in favor of disclosure is as strong as can be found anywhere in the Act." *Id.*

At the first step of this balancing, the parties dispute whether the privacy interest here is "substantial"—in other words, "greater than [] *de minimis*." *White Coat Waste Project v. U.S. Dep't of Veterans Affs.*, 404 F. Supp. 3d 87, 102 (D.D.C. 2019) (internal quotation marks omitted). The court need not decide this question. Assuming the privacy interest clears this bar, it does not outweigh the public interest in disclosure.

Federal government employees have a limited privacy interest in information about their compensation. Office of Personnel Management regulations provide that employees' "[p]resent and past annual salary rates (including performance awards or bonuses, incentive awards, merit pay amount, Meritorious or Distinguished Executive Ranks, and allowances and differentials)" are generally available to the public. 5 C.F.R. § 293.311(a)(4). Defendant admits that the royalty payments are akin to "bonuses" that "reflect on individual performance." Decl. of Gorka Garcia-Malene, ECF No. 24-3 [hereinafter Garcia-Malene Decl.], ¶ 14. NIH royalty recipients therefore have little privacy interest in this information, which is already designated as publicly available. *See Parker v. U.S. Dep't of Just.*, 986 F. Supp. 2d 30, 37 (D.D.C. 2013); *Leadership Conf. on C.R. v. Gonzales*, 404 F. Supp. 2d 246, 257 (D.D.C. 2005).

The cases Defendant cites for the proposition that a person has a substantial privacy interest in their financial information, Def.'s Mot., Mem. of P. & A. in Supp. of Mot. for Summ. J., ECF No. 24-1 [hereinafter Def.'s Mem.], at 13–14, are distinguishable. Those cases did not involve federal employees, so the regulation that diminishes the privacy interest here did not apply. *See Consumers' Checkbook Ctr. for the Study of Servs. v. U.S. Dep't of Health & Hum. Servs.*, 554 F.3d 1046, 1050–51 (D.C. Cir. 2009) (recognizing a substantial privacy interest in information about Medicare payments physicians received for performing covered services); *Multi Ag Media LLC v. Dep't of Agric.*, 515 F.3d 1224, 1230 (D.C. Cir. 2008) (recognizing the same for financial information about farmers who received federal subsidies).

Defendant also asserts three ways that disclosure of the inventor-award amounts would foreseeably harm the inventors' privacy interests, but they are only speculative. *See Reps. Comm.*, 3 F.4th at 369 ("Agencies cannot rely on 'mere speculative or abstract fears . . .' to withhold information." (internal quotation marks omitted) (quoting S. Rep. No. 114-4, at 8 (2015))).

6

*First*, Defendant states that disclosure would "violate the expectation of trust and confidentiality that licensees and inventors have with NIH."  Garcia-Malene Decl. ¶ 14.  True, a court in this District has recognized *licensees'* expectation that information about the royalties they pay will be kept confidential.  *See Pub. Citizen Health Rsch. Grp. v. NIH*, 209 F. Supp. 2d 37, 49 (D.D.C. 2002).  But the *Public Citizen* court did not recognize the same for federally employed inventors, and Defendant does not provide evidence that inventors have such an expectation.  On the contrary, inventors likely could not expect this salary-related information to remain private when the regulation discussed above makes it publicly available.  *See Parker*, 986 F. Supp. 2d at 37; *Leadership Conf.*, 404 F. Supp. 3d at 257.

*Second*, Defendant avers that releasing the requested information would "limit [inventors'] bargaining opportunities when they leave the government and continue to create opportunities to license their future inventions."  Suppl. Decl. of Gorka Garcia-Malene, ECF No. 33-3 [hereinafter Garcia-Malene Suppl. Decl.], ¶ 14.  Once again, this concern is largely speculative.  All Defendant states is that the parties with whom the scientists may later negotiate "would know what these scientists received when they worked at the NIH and how their contributions were valued."  *Id.* Defendant does not elaborate on how knowledge of inventor-award amounts—paid for different inventions and subject to NIH caps—would affect how third parties estimate the value of new inventions in future negotiations.

*Lastly*, Defendant asserts that disclosing the amounts of individual inventor awards would subject inventors to harassment and defamation.  Garcia-Malene Decl. ¶ 14.  To support this claim, Defendant relies primarily on examples of harassment and threats faced by Dr. Anthony Fauci, a former NIH official, stating that "[t]here is every reason to believe that other scientists will receive treatment from the public similar to what Dr. Fauci has received so far."  Garcia-Malene Suppl.

Decl. ¶¶ 16–20.  However, as Plaintiff points out, Dr. Fauci is unique.  He became a "household name" as the face of the country's response to the COVID-19 pandemic.  Pl.'s Reply in Supp. of Pl.'s Mot., ECF No. 35 [hereinafter Pl.'s Reply], ¶ 18.  Defendant presents limited evidence that the threats and harassment Dr. Fauci endured had to do with the royalties he received as an NIH scientist, specifically.  And even if Defendant had presented more evidence to establish that connection for Dr. Fauci, the court cannot conclude on the record before it that lesser-known NIH scientists would garner the same attention and, in turn, face the same dangers.  To be sure, the court recognizes that inventors have an interest in being protected from harassment or, more gravely, threats of violence.  *See Elec. Priv. Info. Ctr. v. Dep't of Homeland Sec.*, 384 F. Supp. 2d 100, 116 (D.D.C. 2005); *Jud. Watch, Inc. v. FDA*, 449 F.3d 141, 153 (D.C. Cir. 2006).  But "[t]o justify [its] Exemption 6 withholdings, the defendant[] must show that the threat to employees' privacy is real rather than speculative."  *Elec. Priv. Info. Ctr.*, 384 F. Supp. 2d at 116 (citing *Dep't of Air Force v. Rose*, 425 U.S. 352, 380 n.19 (1976)).  Defendant has not done so here.

By contrast, there is a clear public interest in knowing the amounts of individual inventor awards.  Defendant even concedes that "disclosing the income of individual inventors may shed some light on NIH's operation[s]."  Def.'s Mem. at 14.  NIH generates upwards of hundreds of millions of dollars per year in royalty payments from companies licensing their technologies, and the inventors collectively receive millions in royalty distributions annually.  Pl.'s Stmt. ¶¶ 19–20.  Plaintiff—along with both the press and political officials—have expressed concerns regarding potential conflicts of interest stemming from these royalty distributions.  Specifically, they question whether inventors' financial interests in the success of their technologies affects how they conduct clinical trials.  Pl.'s Mem. at 17; Pl.'s Mot., Decl. of Amber Todoroff & Exs., ECF No. 28-3 [hereinafter Todoroff Decl. & Exs.], at 10–13 (letter from Senators); *id.* at 53–55 (Associated

Press article).  This court has recognized "a strong public interest in information relating to public officials' potential conflicts of interest."  *Citizens for Resp. & Ethics in Wash. v. USPS*, 557 F. Supp. 3d 145, 158 (D.D.C. 2021).  Such information is undoubtedly relevant to citizens knowing "what their government is up to."  *PETA*, 745 F.3d at 542 (quoting *Reps. Comm.*, 489 U.S. at 773).  And the public inquiries by the media and political officials support the weight of the public's interest in this information.  *See USPS*, 557 F. Supp. 3d at 158–59.

Defendant does not seem to dispute that information about inventor awards sheds light on potential conflicts of interest.  Instead, Defendant argues that disclosing the amounts will provide only "incremental" value, given that Plaintiff already has the names of inventors receiving payments and the number of payments they have received.  Def.'s Reply at 13 (quoting *Schrecker v. U.S. Dep't of Just.*, 349 F.3d 657, 661 (D.C. Cir. 2003)).  But the amounts show the "degree" of the inventors' financial interests, which is relevant to evaluating potential conflicts.  Pl.'s Mem. at 18.  Moreover, even assuming Defendant is correct that the value of this information is small, as explained above, so too is the interest in keeping it private.  "[T]ilt[ing] the balance . . . in favor of disclosure," the court cannot conclude that disclosing this information would amount to a "clearly unwarranted" invasion of privacy.  *Washington Post*, 690 F.2d at 261 (internal quotation marks omitted).  Defendant accordingly is not entitled to withhold the requested information under Exemption 6.

## B.

In the alternative, Defendant seeks to withhold the amounts of individual inventor awards pursuant to Exemptions 3 and 4.  Exemption 3 "permits agencies to withhold information exempted by a qualifying nondisclosure statute" other than FOIA.  *Newport Aeronautical Sales v. Dep't of Air Force*, 684 F.3d 160, 162 (D.C. Cir. 2012) (citing 5 U.S.C. § 552(b)(3)).  The relevant

statute here is the Federal Transfer and Technology Act (FTTA), 15 U.S.C. § 3710a(c)(7)(A), which the parties agree is a qualifying statute under Exemption 3.  *See* Pl.'s Mem. at 6–7; *Pub. Citizen*, 209 F. Supp. 2d at 43.  The FTTA provides that:

> No trade secrets or commercial or financial information that is privileged or confidential, under the meaning of [FOIA Exemption 4], which is obtained in the conduct of research or as a result of activities under this chapter from a non-Federal party participating in a cooperative research and development agreement shall be disclosed.

15 U.S.C. § 3710a(c)(7)(A).  The parties also agree that, because the FTTA references Exemption 4, whether Defendant properly withheld this information pursuant to Exemption 4 resolves the same question for Exemption 3.  *Pub. Citizen*, 209 F. Supp. 2d at 43; Def.'s Mem. at 5; Pl.'s Mem. at 6–7.  The court will therefore focus its analysis on Exemption 4.

Exemption 4 allows agencies to withhold "trade secrets and commercial or financial information obtained from a person and privileged or confidential."  5 U.S.C. § 552(b)(4).  The Exemption 4 analysis has three component parts: the agency must "demonstrate that the withheld information is (1) commercial or financial, (2) obtained from a person, and (3) privileged or confidential."  *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*, 58 F.4th 1255, 1262 (D.C. Cir. 2023) (internal quotation marks omitted).  The second element is the crux of the parties' dispute here.

Exemption 4 covers information "obtained from a person" outside the government.  *Fed. Open Mkt. Comm. of Fed. Rsrv. Sys. v. Merrill*, 443 U.S. 340, 360 (1979).  At first glance, that does not appear to the case here.  The inventor awards are "determined and transmitted by NIH . . . as compensation from the government."  Def.'s Suppl. Stmt. at 1, ¶ 12.  Defendant, using its own formula, generates the amount for an inventor award and distributes it accordingly.  *Id.* at 13, ¶ 27.

10

That distinguishes this case from the case on which Defendant relies, *Public Citizen Health Research Group v. NIH*. Def.'s Mem. at 5–6. There, the court concluded that NIH properly withheld information about the royalties that licensees paid to the agency under Exemptions 3 and 4. 209 F. Supp. 2d at 39. The court reasoned that this information was "obtained from a person" outside the government because, even if the final royalty rate was the product of negotiation between the licensee and NIH, the licensee was required to propose the royalty rate in the first instance. *Id.* at 44–45. Here, NIH alone determines the amounts of the inventor awards. Even if that amount is derived from the amount the licensee pays in royalties, it was not obtained from the licensee in the first instance, as was the case in *Public Citizen*.

That said, the D.C. Circuit has not interpreted the "obtained from a person" requirement literally. Exemption 4 can protect "information third parties provide even when the government incorporates that information into its own documents." *Flyers Rts. Educ. Fund, Inc. v. FAA*, 71 F.4th 1051, 1056 (D.C. Cir. 2023). In *Flyers Rights*, the court concluded that the agency could redact its own comments on documents when releasing them "unredacted would reveal confidential commercial information obtained from" an outside entity. *Id.* at 1057. Similarly, in *Gulf & Western Industries, Inc. v. United States*, the court permitted the agency to withhold portions of an agency-authored report from which "information supplied by [an outside entity] could be extrapolated." 615 F.2d 527, 529–30 (D.C. Cir. 1979).

Defendant posits that such extrapolation is possible here. It asserts that "information already in the public domain could be used in conjunction with the financial data withheld to back-calculate the royalty amounts in the various licenses reflected in the records," Garcia-Malene Suppl. Decl. ¶ 8, which the *Public Citizen* court held is exempt from disclosure, *see* 209 F. Supp.

2d at 44–45, 49.[2]  The formula NIH uses to determine inventor awards has long been available on

the NIH Office of Technology Transfer's website.  Decl. of Tara Kirby, ECF No. 33-4 [hereinafter

Kirby Decl.], ¶ 11.  NIH pays the inventor the first $2,000 of the royalties received from the

licensee each year, 15% of the royalties received above $2,000 and up to $50,000, and then 25%

of the royalties received thereafter up to the $150,000 cap.[3]  *Id.* ¶ 13.  And because, Defendant

states, "the technologies included in a license can be readily deduced or, in the case of exclusive

licenses, are public information," one could use the formula to back-calculate the amount or even

the rate of royalties a licensee paid for a particular technology.  *Id.* ¶¶ 17, 20.  This would reveal

"confidential commercial information" that "could be damaging to a licensee."  *Id.* ¶¶ 18, 21;

*see also Public Citizen*, 209 F. Supp. 2d at 49–50.

      Plaintiff disagrees that such back-calculation is possible.  Plaintiff first disputes that the

technology included in a license can be discerned so easily, as "companies do not necessarily

report which . . . licenses relate to their various products."  Pl.'s Reply, Suppl. Decl. of Amber

Todoroff, ECF No. 35-2 [hereinafter Todoroff Suppl. Decl.], ¶ 6.  Plaintiff then asserts that, even

if a person could determine the relevant technology, several unknown variables would preclude

them from back-calculating the royalty amount paid by the licensee.  For example, the licensing

agreement provides for multiple kinds of royalties, which would make it difficult to use a particular

inventor award to calculate the overall royalty amount or rate.  *Id.*; Todoroff Decl. & Exs. at 45.

Plaintiff also posits that other distributions NIH may have agreed to pay when it receives royalties

from a particular license—such as to other NIH-employed co-inventors, non-employee co-

---

[2] Plaintiff does not ask the court to revisit *Public Citizen*'s conclusion that information about the royalties a licensee pays to NIH is exempt from disclosure.  *See* Pl.'s Mem. at 6 ("While Plaintiff does not necessarily agree with *Public Citizen*'s conclusion that royalty rates and the amounts paid by licensees to NIH should be exempt from production under FOIA, Plaintiff purposefully chose not to challenge Defendant's withholding of these items.").

[3] Although the statute provides that "*at least* 15 percent" of the annual royalties received after the first $2,000 must be distributed to the inventor(s), 15 U.S.C. § 3710c(a)(1)(A)(i) (emphasis added), Defendant avers that it follows the publicly available formula and "does not exercise discretion on an individual basis."  Kirby Decl. ¶ 12.

inventors, or NIH-employed non-inventors—affect the ability to discern the royalty amount, as such sums may affect the inventors' shares but are not included in the formula. Pl.'s Reply ¶¶ 8–11. Lastly, for inventors who have reached the $150,000 annual cap, Plaintiff points out that an individual royalty distribution may not reflect the amount to which the inventor otherwise would have been entitled. *Id.* ¶ 8. That, Plaintiff reasons, prevents a person from plugging the listed amount into the formula to accurately determine the royalties paid by the licensee. Plaintiff concludes that together, these unknown variables prevent members of the public from back-calculating the royalty rate or amount paid by the licensee from an individual inventor award. *See* Todoroff Suppl. Decl. ¶ 6.

The court is thus left with competing accounts as to whether it is possible to back-calculate how much a licensee pays in royalties from the amount NIH distributes to an individual inventor. There is a genuine dispute of material fact as to whether releasing the amounts would provide data from which confidential "information supplied by [an outside entity] could be extrapolated." *Gulf & Western*, 615 F.2d at 529–30. Because "the court must avoid weighing evidence and making credibility determinations" at summary judgment, *Allen v. Johnson*, 795 F.3d 34, 38 (D.C. Cir. 2015), "summary judgment cannot be granted if dueling affidavits create a genuine dispute over issues of material fact," *Gov't Accountability Project v. FDA*, 206 F. Supp. 3d 420, 430 (D.D.C. 2016) (collecting cases). Such is the case here. The court therefore cannot resolve the parties' dispute at this stage, and it will have to hold an evidentiary hearing to resolve it. *Scudder*, 25 F. Supp. 3d at 29.

## IV.

Because there is a genuine dispute of material fact as to whether Defendant properly withheld the requested information pursuant to Exemptions 3 and 4, the court denies Defendant's

Motion for Summary Judgment, ECF No. 24, and Plaintiff's Cross-Motion for Summary Judgment, ECF No. 28. The court need not address the parties' arguments about segregability at this juncture, because resolving that question depends on whether the withheld information is exempt from disclosure in the first place.

The parties shall meet and confer and, by October 7, 2025, submit a Joint Status Report that proposes three dates and times for an evidentiary hearing.

Dated: September 30, 2025

Amit P. Mehta
United States District Judge